## NATIONAL LABOR RELATIONS BOARD v. KEYSTONE FREIGHT LINES.

### No. 2282.

Circuit Court of Appeals, Tenth Circuit.

Nov. 10, 1941.

Rehearing Denied April 6, 1942.

Maurice J. Nicoson, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel,

Frederick M. Davenport, Jr., and Thomas F. Wilson, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Karl H. Mueller, of Fort Worth, Tex. (Harold E. Mueller, of Fort Worth, Tex., on the brief), for respondent.

Before PHILLIPS, MURRAH, and WILLIAMS, Circuit Judges.

MURRAH, Circuit Judge.

By these proceedings, the petitioner, National Labor Relations Board, herein called Board, seeks to enforce an order issued by it against the respondent, the Keystone Freight Lines, herein called Keystone.

Keystone is a common carrier, engaged in the trucking of freight and other commodities over regular routes through the states of Oklahoma, Arkansas, Texas, and Kansas.

On complaint of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, Local 523, herein called Local 523, charging Keystone with unfair labor practices under Section 8(1) (2) (3) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Board found that the Keystone had dominated and interfered with the formation and operation of the Keystone Union, an independent union, composed of the employees of Keystone, and had contributed support to it in violation of Section 8(2) of the Act. The Board further found that the respondents had discharged and refused to reinstate two employees (Roy E. Dowd and Harvey Rolen) because of their union membership and activities in violation of Section 8(3) of the Act, and had thereby interfered, restrained and coerced the employees in the exercise of free bargaining rights guaranteed by Section 7 of the Act, in violation of Section 8(1).

The Board ordered Keystone (1) to cease and desist from its unfair labor practices, (2) to disestablish Keystone Independent and cease giving effect to its bargaining agreement with the Keystone Independent, (3) to offer reinstatement to the two discharged employees and to make them whole for the period during which they had been discharged, and (4) to post appropriate notices showing compliance with the order.

The Keystone denied any illegal contribution, interference, or domination in the formation of the Independent Union in violation of Section 8(2), or any discrimination with respect to hire and tenure in violation of Section 8(3).

The Keystone Independent Union, by intervention, denied the claimed domination and interference, contending that it met the requirements of the Act.

There are two questions presented, (1) does the evidence support the findings of unfair labor practices under Section 8(2), and (2) does the evidence support the findings of the Board that Rolen and Dowd were discharged because of their membership in, and activities with, Local 523 in violation of Section 8(3) (1).

This controversy has its genesis in the formation of the Keystone Union's predecessor, herein called Adams Independent, while most of the employees involved were employed by the Keystone's predecessor, the Adams Storage Company of Tulsa, Oklahoma. The record reveals the following facts:

Keystone was organized in January, 1938. During the first two months of its existence it was purely an intrastate carrier with very few employees and a small volume of business over short routes. On March 23, 1938, it acquired from the Adams Transfer and Storage Company, an interstate motor carrier, a substantial part of the latter's truck routes, together with its automotive, office, shop and warehouse equipment, and leases of terminal facilities. The transfer was effected without interruption of service or schedules on the routes acquired. The Keystone took over, without substantial change, Adams' entire personnel on these routes, including General Manager Sears and Dock Foreman Keffer of the Tulsa, Oklahoma terminal.

Before the above mentioned transaction, and in the Fall of 1937, Local 523 made an effort to bargain with Adams on behalf of certain employees operating out of the Tulsa terminal. Adams, as President of the Adams Company, called a meeting of all of the employees and after stating to them that he had no interest in their union affiliations, took a poll of the employees for the purpose of determining whether or not they wished to be represented by Local 523. By a vote of 18 to 2 the employees repudiated Local 523 as their bargaining agent. Soon thereafter, and in October, 1937, Shutler, a truck driver employed by Adams,

began soliciting membership in an independent union during working hours at the Adams terminal in Tulsa. Thereafter, and in November, 1937, a number of the employees met at the home of Keffer for the purpose of organizing the Adams Union Truck Terminal Road Drivers, Pickup Drivers, Dock Workers, and Garage Men's Union. An attorney was present with prepared articles of association. After discussion, the articles were adopted by those present and the organization of the Union was consummated by the election of Shutler president, Dozier vice-president, Beals secretary, and Summerlin treasurer. The by-laws of the association provided that each member would pay to the Union $1 per month dues. Two of those present at the meeting lived at the home of Keffer, where the meeting was held, but Keffer denied that he had any knowledge of the meeting until after it was held. The Board thought this was difficult to believe, and by inference found that the meeting was held with his knowledge and consent.

Soon thereafter, the Adams Company recognized the Union, entered into a contract with it, the exact contents of which no one seems to know, except that it did provide for closed shop agreement and compulsory payment of dues. There is no evidence concerning wages, hours, or conditions of employment.

After the organizational meeting in November, 1937, no further meetings were held until February, 1938. In the interim, a reduction in wages had been effected about which employees were concerned, but the Union remained silent. All meetings of the Adams Independent, held after the organizational meeting, were on the Adams' dock adjacent to the office, with the knowledge and consent of the Adams Company.

About two weeks after the purchase of the Adams equipment, and the transfer of the Adams personnel to the Keystone, the officers of the Adams Independent called a meeting at which, according to the minutes, the name of the Adams Union Truck Terminal Road Drivers, Pickup Drivers, Dock Workers and Garage Men's Union was changed to the Keystone Union Truck Terminal Road Drivers, Pickup Drivers, Dock Workers and Garage Men's Union. The Keystone Union retained the same officers and pursued substantially the same course, no changes were made except in name.

The Keystone Independent was promptly recognized by the successor company. In fact, an executed contract was submitted to the employees at the meeting and merely accepted by them.

The Board correctly found that there was no substantial change in the Union, either with respect to personnel or its purposes and effect. The Keystone Independent continued to use the Keystone property for its meetings, dues for membership in the Union were collected by the treasurer of the Union who referred each employee to Dock Foreman Keffer, who gave them a badge which the employee was required to wear, indicating the payment of his dues.

At different times, General Manager Sears addressed the Union at their business sessions concerning safety regulations, and by other means clearly manifested grave concern over the perpetuation of the Independent Union.

In the Summer of 1938, Sears told Summerlin that the Keystone Union "was a good organization and as long as the employees had that organization, no other labor organization would come in and interfere with the work." At another time, Sears expressed his concern to Summerlin over the possible ouster of Shutler as president and the election of vice-president Dozier as president of the Union, commenting on the fine job that Shutler was doing as president. Two or three days before March 26, 1939, vice-president Dozier of the Keystone Union presented to Sears a proposed new collective bargaining contract. At Sears' request, Dozier incorporated in the contract a provision deferring the effective date of a 10% wage increase until three months after April 1, 1939.

At a meeting of the Keystone Union held March 26th on Keystone's dock, Dozier urged the adoption of the new contract, stating that Sears advised him that Keystone could not afford an immediate increase in wages. At this meeting, Rolen and Summerlin urged an immediate 10% increase. The next morning after the meeting, Sears accosted Summerlin stating: "Well, Lee I understand you are still not satisfied with your wages and your hours." Sears stated that there would be no wage increase and that he thought "that this fellow Rolen was having a big influence over me [Summerlin] by talking so much in the

meeting." On or about November 1, 1938, Sears approached Rolen at the company dock stating: "I heard last night there was a couple of boys in the office signing a teamsters union contract." Sears wanted to know who was present and promised to keep anything confidential that Rolen would tell him concerning the matter.

In the evening following the Keystone Union meeting of March 26, 1939, Summerlin and Rolen met with Mr. Caldwell (Teamsters Union organizer) at Summerlin's home. During this meeting Summerlin saw Elmer Arnett and Carl Arnett drive by the home. Carl Arnett was an employee of the company and Elmer Arnett was on sick leave. Prior thereto, and on or about March 1st, Summerlin, Rolen and Dowd joined Local 523. About ten days after they had joined the Union, and before the meeting of March 26th, Sears met Summerlin while he was on duty out in the city, asked him to get in his car (Sears' car) and proceeded to interrogate him concerning union activities, particularly inquiring whether or not he thought Rolen would join the Teamsters Union and whether he had any contact with Mr. Caldwell, stating to Summerlin that he thought Summerlin would be better off in the organization that he was in. (Keystone Union).

The Keystone does not attempt to defend the Adams Independent and does not here urge that upon its organization it represented the free and untrammeled wishes of the employees, nor does it attempt to show that it met the requirements of the National Labor Relations Act.

We think it equally clear from the record that the Board was justified, from the evidence, in finding that the Keystone Independent in its operation and effect, was in fact the continuation of the same illegal organization, without indicia of legality.

It is manifest that the Independent Union had its inception under conditions inconsistent with the free exercise of collective bargaining rights granted and required by the National Labor Relations Act and that the Keystone Independent was not divested of this stigma when the Keystone took over the employees, and the name of the Union changed to conform to the successor owner and employer.

It is true, as urged by the Keystone, that it had nothing to do with the formation of the Union, while its members were employees of the Adams Company, but instead of evidence of withdrawal from further domination and interference, the evidence affirmatively shows that it was the purpose of the Keystone to continue the same domination and illegal support after it succeeded the Adams Company. Moreover, it is shown from the record that the Keystone Independent continued to be dominated and supported by the successor Keystone.

We conclude that the Board's findings of violation of Section 8 (2) is amply supported by the evidence and the modified order should be enforced.

The findings of the Board that the Keystone had violated Section 8(1) (3) of the Act by discharging employees Rolen and Dowd, because of their Union activities and affiliations, is based upon inferences and circumstances drawn from Keystone's manifest hostility to Local 523, and its preference for the Keystone Independent, coupled with the fact that Rolen and Dowd, together with Summerlin, joined the Union immediately before their discharge.

There is no direct evidence in the record that the management knew that Rolen and Dowd were in fact members of Local 523 at the time of their discharge, and the Keystone contends that because there is no evidence that the management knew of Rolen and Dowd's affiliation, it could not have been the cause for discharge, especially in view of other good and sufficient reasons advanced in the record for such discharge. It is, however, fairly inferable from the record that Sears had knowledge of the activities of Local 523 and that at least Summerlin and Rolen had some connection with it.

Summerlin and Rolen had been active in opposing the postponement of the wage increase at the Keystone Independent meeting on March 26th. Dowd had complained of his long hours of employment and had made derogatory statements concerning the ineffectiveness of the Keystone Union. On the following day, March 27, 1939, Rolen was discharged and on March 28, 1939, Dowd was discharged. Rolen was discharged by Dock Foreman Keffer and Dowd was discharged by Mr. Spurgeon, president of the company, who had known Dowd previous to his present employment and for whom Dowd had worked as a bus driver in the operation of another company.

A number of reasons, exclusive of union activities and affiliations, were advanced by

the management for the discharge of these two employees. The management stated that Dowd was discharged because his job was eliminated and that he was physically unfit for his job. The record shows, however, that although Dowd's duties as night watchman were not filled until August 7, 1939, at which time his duties as night watchman were assumed by the Mr. Arnett who had been on sick leave, his duties as dock hand from 6 p.m. until midnight were taken over immediately upon his discharge by one hired the previous day. Until his discharge, the record does not show that any complaint had been made concerning the performance of his duties.

Rolen was a pickup driver, he had been an employee of the Keystone since June, 1938 and his work was apparently satisfactory. The management contended that they discharged him because of his physical unfitness by reason of injuries he had sustained while in the employ of another carrier. Rolen had filed a suit for $56,000 against his former employer and Sears had questioned Rolen concerning the accident, but Rolen had stated that he was only interested in recovering the medical expenses incurred. The management strenuously contended that the insurance company had required his discharge by reason of his physical impairment. There is nothing in the record to show that before his discharge he was physically unfit or inefficient.

■ There is evidence in the record, produced on behalf of the respondent, which would justify a finding that Rolen and Dowd were both discharged for adequate reasons other than their union activities and affiliations, but we are not permitted to weigh the evidence to determine which of the reasons advanced under the facts and circumstances are most feasible or cogent. Congress intrusted the Board, not the courts, with power to draw inferences from the facts. The Board has the function of appraising conflicting and circumstantial evidence and the weight and credibility of testimony. N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N.L.R.B. v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396. "It is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged." International

al A. of M. v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 89, 85 L.Ed. 50.

■ The power of the Board to order reinstatement of employees which it has found to have been discharged by reason of union activities and affiliations is remedial and designed to "effectuate the policies of [the] Act." Phelps Dodge Corp. v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 849, 85 L.Ed. 1271, 133 A.L.R. 1217; Continental Oil Co. v. N.L.R.B., 313 U.S. 212, 61 S.Ct. 861, 85 L.Ed. 1292.

When the findings of the Board are considered, against the background of manifest hostility of Keystone to Local 523 and its illegal interest in the activities of its employees in connection with Local 523, coupled with the established fact that both Dowd and Rolen were active leaders in the exercise of the right of self-organization, guaranteed by the Act, we are unable to say that the inferences drawn by the Board are not supported by any substantial evidence.

■ ■ It is not the purpose of the National Labor Relations Act, or within the province of the Board granted to it by the Act, to interfere with the normal exercise of the right of the employer to select its employees or to discharge them, but under cover of this right, the employer may not intimidate or coerce the employees with respect to their right of self-organization for purposes of collective bargaining. On the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for legitimate reasons. N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; N.L.R.B. v. Fansteel Corp., 306 U.S. 240, 254, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599. Within these limits " * * * the question whether reinstatement or reemployment would effectuate the policies of the Act is committed to the decision of the Board in the exercise of its discretion subject only to the limitation that its action may not be 'arbitrary, unreasonable or capricious.' " N.L.R.B. v. Fansteel Corp., supra, 306 U.S. page 258, 59 S.Ct. page 497, 83 L.Ed. 627, 123 A.L.R. 599.

■ From the whole record, we are unable to say that the order of the Board reinstating the employees and making them

whole is arbitrary, unreasonable, or capricious, and not supported by substantial evidence.

The modified order will be enforced.