**NATIONAL LABOR RELATIONS BOARD v. BLACKSTONE MFG. CO., Inc.**

**No. 9.**

Circuit Court of Appeals, Second Circuit.

Nov. 17, 1941.

**634**

Ida Klaus, and Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Frederick M. Davenport, Jr., and Mary Lemon Schleifer, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

J. Russell Rogerson, of Jamestown, N. Y., for respondent.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us on a motion by the National Labor Relations Board under § 10(e) of the Act, 29 U.S.C.A. § 160(e), for an order enforcing its own order made in a proceeding under § 10(c). The order directed the respondent, the Blackstone Company, to bargain with a lodge of the International Association of Machinists, "certified" by the Board as bargaining representative of its employees; and also enjoined the respondent from telling its employees that their union activities might close down the plant. The respondent's objections to the motion are (1) that there was no adequate evidence to support the Board's findings on which its order was based; (2) that the form of the order was irregular so far as it enjoined, not only the respondent and its officers and agents, but also "its successors and assigns"; and (3) that the controversy has become moot because the respondent has sold all its property to its parent, the Jamestown Metal Equipment Company, and has dismantled its plant and stopped all business.

The first question is whether the union which the Board ordered the respondent to recognize, was in fact the lawful bargaining representative of its employees; and that depends upon the propriety of a "certificate" issued by the Board at the conclusion of a proceeding instituted under § 9 in March, 1938. The union had begun to organize the plant in the autumn of 1937 and by the next spring felt strong enough to petition the Board for a "certificate". At hearings before an examiner appointed in this proceeding the union appeared and offered in evidence 121 cards, each authorizing it to represent the signer; all the signers were or had been, employees, though a number were not members of the union. These cards had all been signed between April 26, and May 10, and all but two of them had been witnessed by the union's president, Chapman, or by a former president, Johnson. Chapman was called, authenticated those cards he had witnessed, and swore that when the union had petitioned for a "certificate"—on March 23, 1938—the respondent had had 150 employees other than "supervisory and clerical", and that on May 11 it had had 111. (Obviously, therefore, some of the cards bore the names of employees not on the payroll at the later date. Nevertheless, the cards were evidence of a clear majority of all those still employed in May, even if all those who had left the company's employment were among the signers.) Upon this showing the union offered the cards in evidence, "with the condition attached that they are being introduced in evidence solely for examination by the Trial Examiner or the Board;" the excuse for this limitation being that the respondent might use the cards to discriminate against the signers. The examiner admitted the cards with this reservation over the respondent's protest, and the union, after calling Johnson to authenticate the signatures upon those cards which he had witnessed, closed its case. The respondent thereupon asked the examiner for subpoenas for all signers of the cards, and the examiner said he would consider the request. When the hearing went forward on the next day the union withdrew "the reservation and the cards" were "offered in evidence" unconditionally; but the respondent repeated its request for subpoenas. This was not granted, and the hearing was adjourned for six days more, after which it proceeded before another examiner, who closed the hearings without passing on the respondent's request. On his report the Board "certified" the union, finding as a reason for not issuing the subpoenas that the demand for them had been made "merely to obstruct the proceeding."

In National Labor Relations Board v. Dahlstrom Metallic Door Company, 2 Cir., 112 F.2d 756, 758, the Board had also refused a blanket request of the employer for subpoenas to all his employees; notwithstanding which we affirmed the order. We declared that "requests for subpoenas should be viewed sympathetically in order to ensure a fair hearing"; but that the Board's rule (§21, Art. II) was a reasonable one that the applicant should "specify the name of the witness and

the nature of the facts to be proved by him". We sustained the refusal because what the respondent "specified" as to "the nature of the facts to be proved" by the witnesses was irrelevant. In the case at bar the respondent's only statement of "the nature of the facts to be proved" was that it wished "to cross-examine them" (the signers of the cards) "as to the authenticity of their signatures and as to the present status of any of the alleged authorizations contained on the cards". This demand the Board might indeed have been obliged to grant, if the respondent had examined the cards and compared them with signatures in its possession, or if it had proved that it had no means of comparison. But it refused even to look at the cards, alleging that it might later be charged with discrimination, a position clearly inconsistent with a desire to cross-examine the signers. The employees were presumably within its reach without subpœna anyway, and the request had every mark of being what the Board declared that it was. While we should indeed be jealous of any denial of process to an employer, the Board is not powerless to prevent itself from being put upon by frivolous and dilatory demands. For these reasons we hold that there was enough evidence to support the Board's "certificate" under § 9, 29 U.S.C.A. § 159, and its order compelling the respondent to bargain with the union.

 Since there was also evidence to support the finding that the respondent had stated to its employees that the union activities "would result in the closing of the Blackstone plant", there remain for discussion only the form of the order and the question whether the whole controversy has become moot. We take up first the form of the order. In National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 104 F.2d 302, we held that a successor corporation, the Monarch Company, which had participated with the original respondent, the Hopwood Company, in later "unfair labor practices" of the kind forbidden by our "enforcement order", might be punished as contumacious of that order. There can be no doubt that this is the law; equity has always treated as contumacious those who take an actual part in the defendant's own violation of its injunction, provided they have notice of the decree; § 383 of Title 28, U.S.C.A. states no more than the common-law. In re Lennon, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110. Hence (laying aside the question whether the respond-

ent can in any event raise the question, not being itself directly affected) we will not cut out the phrase, "successors and assigns". In allowing these words to stand we wish to make it clear, however, that we do not hold that a "successor" or an "assign" will be in contempt of our order if it should (even after notice of the order, but without participating with the respondent in any disobedience by it) do exactly those things which the order forbids. In other words, we do not hold that those words impose any liability which would not exist without them. Scott v. Donald, 165 U.S. 107, 117, 17 S.Ct. 262, 41 L.Ed. 648; Hitchman C. & C. Co. v. Mitchell, 245 U.S. 229, 234, 235, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461; Chase National Bank v. Norwalk, 291 U.S. 431, 435, 436, 54 S.Ct. 475, 78 L.Ed. 894; Alemite Mfg. Corp. v. Staff, 2 Cir., 42 F.2d 832. Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 119, 58 S.Ct. 113, 82 L.Ed. 141, did not so hold; nor are we sure that Bethlehem Steel Co. v. National Labor Relations Board, App.D.C., 120 F.2d 641, 650, 651, did so either, although the majority decided that the order might stand, as we are deciding here. In National Labor Relations Board v. Timken Silent Automatic Co., 2 Cir., 114 F.2d 449, although we refused to include the parent company in the order, we left it open to the Board to prove that it might so participate in future contempts of its subsidiary, the respondent, as to become a party to the subsidiary's disobedience and be punishable for that reason.

 The last question is whether the controversy has become moot. This hinges upon what took place after the Board's order passed on November 17, 1939. The original complaint had included, not only the Blackstone Company, but its parent, the Jamestown Company; as to which, however, the Board dismissed the proceeding. On May 15, 1940, the union filed a motion with the Board, praying that it should take further evidence and direct the Jamestown Company to bargain with the union. The union alleged, though not under oath, that the Jamestown Company had "liquidated" the assets of the Blackstone Company and "discontinued its business", and that the old employees of the Blackstone Company "are now employed by the Jamestown Metal Equipment Co. Inc. which has assumed the operations formerly performed" by the Blackstone Company. The Board denied the motion, reciting in its order that "these

facts"—those recited in the motion— "if true, constitute no ground for granting the motion". We do not say that, if the respondent had proved before us that the facts stated by the union were true, we ought not to hold that the whole controversy had become moot; but it has not done so; it merely asks us to accept the union's unsworn statement as to facts which are peculiarly within its own knowledge, but as to which it remains silent. We have no way on this record of knowing what are its present activities, or that there can be no chance of its resuming those which the Board has found unlawful.

The usual enforcement order will pass.