## NATIONAL LABOR RELATIONS BOARD v. GLUEK BREWING CO. et al.

### No. 12625.

Circuit Court of Appeals, Eighth Circuit.

Aug. 7, 1944.

Frank Doniner, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Ruth Weyand and Helen F. Humphrey, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Oscar J. Berg, of Minneapolis, Minn., for respondent Bach Transfer & Storage Co.

Patrick L. Farnand, of Minneapolis, Minn. (Chester L. Nichols, Gerald T. Mullin, and John D. Bleecker, all of Minneapolis, Minn., on the brief), for respondent Gluek Brewing Co.

I. E. Goldberg, of Milwaukee, Wis. (Joseph A. Padway, of Milwaukee, Wis., on the brief), for intervener Brewery and Beverage Drivers, Warehousemen and Helpers Union, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L. Local 792.

Martin F. O'Donoghue and Mr. Thomas X. Dunn, both of Washington, D. C., for intervener Brewery, Malthouse and Soft Drink Workers Local Union No. 205, Affiliated with the International Union of United Brewery, Flour, Cereal and Soft Drink Workers of America.

Before STONE, THOMAS, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

This is a proceeding by the National Labor Relations Board to enforce an order against Gluek Brewing Company and Bach Transfer and Storage Company. Brewery, Malthouse and Soft Drink Workers Local Union No. 205 (affiliated with the International Union of United Brewery, Flour, Cereal and Soft Drink Workers of America) and Local No. 792 Brewery and Beverage Drivers, Warehousemen and Helpers Union (affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L. were allowed to intervene by brief and oral argument—No. 205 in support of the enforcement and No. 792 in opposition.

This is another unfortunate labor jurisdictional conflict where the employer is the unwilling and unhappy battleground. The origin and the development of the cleavage between the two unions are unimportant here but, for the curious, may be found in Green v. Obergfell, 73 App.D.C. 298, 121 F.2d 46, 138 A.L.R. 258. It is here enough that it existed. Each union included beer truck drivers and helpers in its membership and we are concerned with those who delivered the beer produced by Gluek.

A brief outline of the present controversy is as follows: Gluek operates a brewery in Minneapolis and sells its product both locally and interstate. Bach does a truck transportation business in Minneapolis. For many years prior to and including 1941, Gluek had a closed shop contract with No. 205. This covered brewery workers and also the truck drivers who delivered the beer in Minneapolis area.[1] In November, 1941,. the Teamsters started a campaign to induce the Brewers to leave No. 205 and join No. 792. This campaign took the forms of soliciting this change in unions, of urging customers of Gluek not to accept deliveries and of intimidation of Gluek and the Brewers. The tactics of threatened boycott and of intimidation so effectively reduced deliveries that there were practically none on some days. On November 27, the Brewers changed their affiliation to No. 792 and deliveries by them proceeded unimpeded until December 3. On that date, the Brewers decided to renounce this change and return to No. 205. .The next morning, Gluek refused to allow its delivery trucks to go out because of fear of threatened injury to the drivers and the trucks. On December 5 or 6, Gluek called Bach, which had a contract with Teamsters, and made a temporary arrangement for delivery of its beer by Bach. January 30, 1942, this informal arrangement was replaced by a ninety-day contract. On the same day, Gluek sold eight of its delivery trucks to Bach which began using them February 2. On March 24, Gluek sold another delivery truck to Bach. April 28, this delivery contract was extended for one year.

No beer was delivered by any drivers of Brewers after December 3 except by five men who applied to Bach for employment on February 2 and 4, 1942. These five men became members of Teamsters. After December 3 until February 3, the drivers in Brewers remained on Gluek payroll as drivers doing such other work as was available at the brewery. On the latter date, they were discharged. Since discharge as drivers, they have been offered other work by Gluek and most of them have been retained doing such other work as available— usually part time.

Brewers filed a complaint with the Board, charging unfair labor practices under Section 8(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3), against Gluek and Bach. The charge, filed with the Board, alleged a continuing at-

---

[1] Hereinafter, the beer truck drivers of No. 205 will sometimes be referred to as the Brewers and the members of No. 792 as the Teamsters.

tempt (since late in November, 1941) by Gluek to induce members of Brewers to' change union membership to Teamsters, although it had a contract with Brewers; a suspension of its delivery department, transfer of its trucks to Bach and employment of Bach to make deliveries; since December 3, Gluek has refused to employ members of Brewers as "drivers and helpers" but has given them other part time work; and the entire procedure "is a subterfuge intended to make possible the employment of members of Local Union 792," participated in by both companies.

The Board found that an officer of Gluek and several of its supervisory employees had (from November 27, 1941 to January 30, 1942) interfered with, restrained, and coerced the members of Brewers; that transfer of deliveries to Bach was "undertaken by respondents because of the drivers' and helpers' continued adherence to Local 205, and their failure to join Local 792"; that Bach knew, at the time of such transfer, that Gluek was involved in a jurisdictional labor dispute; that, under the arrangements with Bach, Gluek has "retained substantial control over the delivery of its products, the work and working conditions of the new drivers and helpers, and ultimately, their tenure of employment"; that two members of Brewers (named in the complaint) had been "yard men" and not discharged from their positions; and that one (Mike Heller) was inducted into the armed forces on July 27, 1942.

The Board ordered both respondents, "jointly and severally," to cease and desist (a) from discouraging membership in Brewers or encouraging membership in Teamsters "by discharging or refusing to reinstate any of their employees or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment;" (b) from giving any effect to any agreement with or recognizing Teamsters "as the representative of drivers and helpers engaged in delivery of the respondent Gluek's products;" and (c) from in any way interfering with, restraining, or coercing their employees in the exercise of their rights under section 7 of the Act, 29 U.S.C.A. § 157. Affirmatively, the Board required reinstatement or preferential employment and reimbursement of named discharged

employees, with special provisions as to the soldier (Mike Heller); withholding of recognition of Teamsters, "as the representative of their drivers and helpers engaged in the delivery of the respondent Gluek's products," for labor negotiation purposes; posting of notices and informing the Board thereof; and dismissal of the complaint as affecting the two yardmen.

The issues raised here in opposition to enforcement of the order of the Board may be summarized as follows: (a) That respondents were not guilty of unfair labor practices; (b) that Bach was not engaged in interstate commerce and, therefore, not within the Act; (c) that Bach was an independent contractor and, therefore, not within the Act; (d) that the Board did not and could not find that the arrangement between Gluek and Bach was motivated by desire to defeat the rights of Brewers under the Act; (e) that two provisions of the order are impossible of performance; and (f) that one provision of the order is illegal. It is convenient to discuss together the issues (a) of unfair labor practices and (d) as to the finding or possibility of finding that the delivery arrangement was, under the Act, improperly motivated.

## I. Unfair Labor Practices and Improper Motive.

The lines of argument advanced by Gluek are that the delivery arrangement was for the purpose of effecting an economy; that the statements of its official and its supervisory employees do not sustain a finding of intimidation, coercion or restraint of its employees; and that the delivery arrangement with Bach was not prompted by animus against Brewers or by any intent or purpose to discriminate against them. Bach argues that it did not discriminate in hiring drivers and helpers to deliver for, Gluek. The argument of intervener Local 792 is that the Board did not find that the delivery arrangement was "for the purpose of defeating the rights of the employees [Brewers] under the" Act; that the Board found the "effect" of such arrangement that an intent to violate the Act existed; and that such determination is not of a fact but is an erroneous conclusion of law which the Board had no power to make.

■ While there was conflict in the evidence as to important particulars,[2] yet there was very substantial evidence to sup-

[2] Where there is such conflict, we must and do accept the determination of the Board since ' these conflicts might reasonably have been so determined.

port the findings of the fact situation by the Board. For years, Gluek had operated under a closed shop contract with Local 205 (including drivers and helpers) and there is scant proof that it was not entirely satisfied therewith up until Teamsters began their raid late in November, 1941. The methods of that raid took forms which changed the entire situation in so far as Gluek's drivers and helpers were concerned. The even tenor of Gluek's business was disrupted. It experienced a boycott and threatened harm to its drivers and trucks which imperilled the existence of its local business. All of its actions thereafter had as their main purpose and intent escape from this unfortunate situation. It may be that a possible saving in expense of deliveries figured in the picture but the coincidence of time and Gluek's actions convince that the immediate, pressing, controlling motive was such escape.[3]

Its first attempts had nothing to do with economies. Those attempts were to induce its drivers and helpers to join the Teamsters. The trouble began November 24, 1941. On that morning, representatives of Teamsters met the drivers and helpers near the brewery as they were going to work and urged them to join Teamsters. The drivers worked on that and the following day. They were followed by Teamsters representatives who went in and warned their customers not to take Gluek beer or deliveries of milk and other things would be stopped, the saloons picketed and signs put up warning A. F. of L. members not to buy there. This action prevented deliveries to these customers. November 26, Local No. 205 held a meeting to determine whether to go into Teamsters and decided adversely. When the drivers went to work November 27, there were eight or nine cars parked near the brewery,

each containing from two to four Teamsters members. The drivers were met at the time clock by Marion Norbeck[4] who told them that Alvin Gluek would not let the trucks go out. While the drivers were grouped outside the brewery office, Norbeck said to them "What are you fellows going to do now? Are you going to let them [drivers for another brewery] go out and plug up your stocks [stops] for you? You fellows better go in the lunch room and talk this thing over what you are going to do." They received information that a competing brewery was sending out trucks under Teamsters—apparently, the drivers of that brewery had theretofore been members of Brewers. Norbeck came in and said "there are some friends of yours in here that want to talk to you." These were the acting secretary of Local No. 792 and an international representative of A. F. of L. Teamsters Union. After hearing these two men the drivers decided to join Teamsters and then and there secured cards from No. 792. Right afterwards, the drivers asked Norbeck if it was "alright to punch the clock? We got the cards, now" to which Norbeck replied, "Alright, fellows, you got the cards, you can punch." From that day through December 2, the drivers made deliveries unmolested.

On December 3, there was another meeting of Local 205 at which the drivers determined to withdraw from Local 792 and rejoin Local 205. The morning of December 4, the president of Gluek noted a number of "squad cars picketing the plant, or rather, blocking exits at the plant." In view of this situation, he would not permit the trucks to go out because of fear of injury to the drivers and to the trucks. December 6, Gluek ordered trucks from Bach to make the deliveries on an hourly pay basis.[5] On December 6, Norbeck said to

---

[3] The treasurer of Gluek testified as follows:

"Q. (By Mr. Brownstein): And you were faced, as a result of that jurisdictional dispute, with this loss of business, and you had to do something about it? A. Yes, sir.

"Q. And so at that time, I think it was on or around December 6th, you called the Bach Transfer Company to deliver your products? A. Yes, sir.

"Q. And that eliminated any boycott on the part of 792 of your customers, so far as you knew? A. So far as I knew.

"Q. Now, it was a matter of doing that or else facing possible bankruptcy or liquidation, or going out of business

entirely, wasn't it? A. It made considerable difference in our business, if we lost our city trade.

"Q. So you decided to take the method that you did take? A. Yes.

[4] Alvin Gluek was president and manager of Gluek. Norbeck was a "dispatcher" who was the immediate supervisor of the drivers, with limited right to hire and fire and whose duty it was to tell drivers where to deliver beer.

[5] This was an ordinary arrangement for Bach with customers who wished things hauled. Gluek had theretofore made such arrangements in "periodic and isolated instances." The drivers of Bach trucks were members of Local No. 792.

a group of drivers: "Well, they called up Bach Transfer to deliver your beer. What are you guys going to do, are you going to let them get away with it?" The next day, Norbeck came into the lunch room where a number of the drivers were and said "I am going to tell you something. Alvin Gluek is damn mad at you, and boy, you are going to find some tough working conditions around here after this thing is all settled." About December 6 or 7, William Mueller (in charge of the building and of certain accounts for Gluek) said, to a group of drivers, "Why don't you guys get wise to yourselves and go to work." Early in December, the president of Gluek told representatives of Local No. 205, in his office, that he could not let the trucks go out and have them and the men subject to violence but as soon as "beer was delivered in Minneapolis and the dispute was cleared up that I would put our trucks on the street" with Local No. 205 drivers. About this time, two drivers went to the office of the president of Gluek and asked him what he would do in their position to which he replied "The A. F. of L. is too big, you can't lick them. It is impossible to beat them." During December, Arnold Klein, Sr., (credit manager for Gluek) several times said to drivers, "Why don't you fellows sign up and go to work?"

On January 30, 1942, the temporary delivery arrangement was replaced by a ninety-day cost plus 10% contract with Bach and eight trucks were sold by Gluek to Bach. On January 31, 1942, representatives of Teamsters held a meeting across the street from the brewery to which Gluek drivers were invited. The purpose of the meeting was to induce the drivers to join Local No. 792. Norbeck said to several of the drivers: "There is a meeting across the street at the Rockaway over there. The fellows from 792 want to talk to you." When a driver stated he would stick with 205, Norbeck said: "That is alright, but you better go over and see what they got to say anyway." Norbeck allowed the drivers to attend this meeting without loss of time. At this meeting, the representatives of Local No. 792 urged the drivers to join that union. When some of them expressed a preference to work for Gluek instead of Bach, the representative stated: " 'I tell you one thing; we are still holding those trucks, and if you fellows feel you want to join us,' he said, 'those trucks will go on the street just as they were before.' And I said, 'How do you know that?' He said,

'Mr. Gluek wants you boys on those wagons; he doesn't want the Bach Transfer.' " From December 3 to February 3, 1942, the drivers remained on Gluek payrolls doing such other work as available. On February 3, they were discharged.

 The above and other evidence draws a rather clear picture of what took place and why. It shows that Gluek was satisfied with its long existing delivery arrangement; that the trouble was entirely caused by the economic pressure by Teamsters in their effort to compel the Gluek drivers to transfer their allegiance from Brewers to Teamsters; that this pressure was so effective that it forced Gluek to act; that this action was motivated, in large part if not entirely, by the purpose of avoiding disruption and loss of business; that Gluek knew its action would have the effect either of changing such allegiance or of depriving the drivers of their jobs by transferring the work to a place where it could be done by members of Teamsters; that Gluek first used pressure to bring about the first alternative; that failing in this, it adopted the other alternative; and that the known inevitable result of such action by Gluek has been to aid one labor union in a conflict with another union with which it had a labor contract. Albeit unwillingly, yet there is no doubt that Gluek participated in a jurisdictional labor dispute and its participation had the effect, well known to it in advance, of favoring one union over the other. It is clear that it had no purpose—in the sense of animus or desire—to injure one or to help the other. Its underlying and compelling purpose was to save itself. But to accomplish this result, it consciously interfered in a labor situation by actively favoring one union over another. This was properly held by the Board to be an unfair labor practice under the Act because economic interests of an employer are not valid reasons for violation of the Act (National Labor Relations Board v. John Engelhorn & Sons, 3 Cir., 134 F.2d 553, 557; National Labor Relations Board v. Hudson Motor Car Co., 6 Cir., 128 F.2d 528, 532; Wilson & Co. v. National Labor Relations Board, 8 Cir., 123 F.2d 411, 417; Warehousemen's Union, etc., v. National Labor Relations Board, 74 App.D.C. 28, 121 F.2d 84, 87; South Atlantic S. S. Co. v. National Labor Relations Board, 5 Cir., 116 F.2d 480; McQuay-Norris Mfg. Co. v. National Labor Relations Board, 7 Cir., 116 F.2d 748, 752, certiorari denied 313 U.S. 565, 61 S.Ct. 843, 85 L.Ed.

1524; National Labor Relations Board v. Star Pub. Co., 9 Cir., 97 F.2d 465, 470, and compare National Labor Relations Board v. Electric Vacuum Cleaner Co., 315 U.S. 685, 62 S.Ct. 846, 86 L.Ed. 1120, rehearing denied 316 U.S. 708, 62 S.Ct. 1038, 86 L.Ed. 1775, and National Labor Relations Board v. Polson Logging Co., 9 Cir., 136 F.2d 314). In National Labor Relations Board v. Hudson Motor Car Co., 6 Cir., 128 F.2d 528, 533, it was stated: "We think it right and just to say that so far as the record shows, respondent has not wilfully violated the provisions of the Act, but the intent of the employer is not within the ambit of our power of review. When it is once made to appear from the primary facts that the employer has violated the express provisions of the Act, we may not inquire into his motives." The fact situations in South Atlantic S. S. Co. v. National Labor Relations Board, 5 Cir., 116 F.2d 480 and National Labor Relations Board v. Star Pub. Co., 9 Cir., 97 F.2d 465 are, in important respects, similar to this case. It may be said, also, that Gluek would have been justified, if not indeed obligated, to oppose Teamsters and to support Brewers because it had an unimpeachable closed shop contract with the latter. Act § 8(3), Title 29 U.S.C.A. § 158(3); International Assoc. of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 81, 61 S.Ct. 83, 85 L.Ed. 50; Warehousemen's Union, etc., v. National Labor Relations Board, 74 App.D. C. 28, 121 F.2d 84, 87; M. & M. Woodworking Co. v. National Labor Relations Board, 9 Cir., 101 F.2d 938, 940.

It was found, also, that Bach was, jointly with Gluek, guilty of unfair practices and subject to and covered by the order of the Board. Bach contests the order as to it on the grounds (1) that it is not engaged in interstate commerce and, therefore, not subject to the Act; (2) that it acted as an independent contractor and, therefore, is not responsible for what Gluek may have done; and (3) that it was not guilty of unfair labor practices. The first and second have to do with the scope or coverage of the Act, the third with the factual situation, if Bach is within such scope.

■ (1) The evidence supports the determination that Bach is engaged in interstate commerce. While this is not true as to these deliveries of beer from Gluek's brewery to its local customers in Minneapolis, it is clear that a substantial portion of Bach's hauling was connected with freight to and from railroads transporting such in interstate commerce. See Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 219-222, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 31, 32, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. If a Board proceeding were against Bach alone for some violation of the Act, the jurisdiction would exist because it was engaged in interstate commerce within the broad meaning of the Act. Where, as here, Bach is jointly held with Gluek for unfair practices in which Gluek was the prime movant, it would seem that it is immaterial whether Bach was engaged in interstate commerce if it was used to effectuate a violation of the Act.

■ The scope of the Act is as broad as the power of Congress over commerce. National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014. It expressly covers all situations "affecting" interstate commerce. § 2(7), 29 U.S.C.A. § 152(7). The dividing line is not whether a particular business is essentially intrastate but, in the situation in that business before the court, "what is the *relation* between the activity or condition and the effect" on interstate commerce. Carter v. Carter Coal Co., 298 U.S. 238, 308, 56 S.Ct. 855, 871, 80 L.Ed. 1160; Wickard v. Filburn, 317 U.S. 111, 120, 63 S.Ct. 82, 87 L.Ed. 122. Thus "it follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power" (United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726; Wickard v. Filburn, 317 U.S. 111, 124, 63 S.Ct. 82, 87 L.Ed. 122); and "Acts having that effect are not rendered immune because they grow out of labor disputes" (National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 31, 32, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352). If an employer can use a separate, independent, purely intrastate business as a means of effectuating an unfair labor practice and that business is *always* beyond reach of the Board, the administration of the Act and the application of remedies by the Board,

would be effectually and improperly restricted.

■ (2) Bach contends that it acted as an independent contractor and, therefore, did not violate the Act nor is responsible for any violation by Gluek. The fact that Gluek used Bach, even if Bach be an independent contractor, would not protect Gluek from committing unfair practices if a purpose in such use was forbidden interference in labor matters. Williams Motor Co. v. National Labor Relations Board, 8 Cir., 128 F.2d 960, 964. However, this does not necessarily mean that Bach, if an independent contractor, would also be subject to the charge of unfair practices. It might be an entirely innocent and unconscious instrument. On the other hand, it might consciously give aid to the effectuation of an unfair practice by another. Where an independent contractor knowingly participates in the effectuation of an unfair practice, it places itself within the orbit of the Board's corrective jurisdiction. "Interruption of commerce through strikes and unrest may stem as well from labor disputes between some who, for other purposes, are technically 'independent contractors' and their employers as from disputes between persons who, for those purposes, are 'employees' and their employers." National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 858. Common law or statutory concepts of legal relationships must yield in so far as is necessary to effectuate the purposes of the Act.[6] The intent that the Act should be so applied is evidenced by the definitions of "employer" and "employee" as stated in section 2(2, 3) of the act, 29 U.S.C.A. § 152(2) and (3).[7]

■ (3) Finally, Bach contends that it engaged in no unfair practices. This is a fact question. The Board has found Bach

---

[6] For illustrations as to various legal relationships so treated see the following: as to agency, International Assoc. of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, 80, 61 S. Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. National Labor Relations Board, 311 U. S. 514, 520, 521, 61 S.Ct. 320, 85 L.Ed. 309; Gamble-Robinson Co. v. National Labor Relations Board, 8 Cir., 129 F.2d 588, 590, and Eagle-Picher M. & S. Co. v. National Labor Relations Board, 8 Cir., 119 F.2d 903, 910; master and servant, National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851; National Labor Relations Board v. Blount, 8 Cir., 131 F.2d 585; independent contractor, the Hearst Publications and Blount cases, just cited; subsidiaries or affiliated concerns, Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815; National Labor Relations Board v. Swift & Co., 6 Cir., 127 F.2d 30, 32; Bethlehem Steel Co. v. National Labor Relations Board, 74 App.D.C. 52, 120 F.2d 641, 648; National Labor Relations Board v. Alloy Cast Steel Co., 6 Cir., 117 F.2d 302; Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 109 F.2d 587; dissolved partnership, National Labor Relations Board v. Colten, 6 Cir., 105 F.2d 179, 182; purchaser, National Labor Relations Board v. Keystone Freight Lines, 10 Cir., 126 F.2d 414; reorganized company, National Labor Relations Board v. Baldwin Loc. Works, 3 Cir., 128 F.2d 39; receivership, National Labor Relations Board v. Bachelder, 7 Cir., 120 F.2d 574, 576; successor company, National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 104 F.2d 302. This note is not intended to be comprehensive as to either legal relations or to labor cases dealing therewith. It is merely illustrative of a principle of decision.

[7] "In short, when the particular situation of employment combines these characteristics, so that the economic facts of the relation make it more nearly one of employment than of independent business enterprise with respect to the ends sought to be accomplished by the legislation, those characteristics may outweigh technical legal classification for purposes unrelated to the statute's objectives and bring the relation within its protections.

"To eliminate the causes of labor disputes and industrial strife, Congress thought it necessary to create a balance of forces in certain types of economic relationships. These do not embrace simply employment associations in which controversies could be limited to disputes over proper 'physical conduct in the performance of the service.' On the contrary, Congress recognized those economic relationships cannot be fitted neatly into the containers designated 'employee' and 'employer' which an earlier law had shaped for different purposes. Its Reports on the bill disclose clearly the understanding that 'employers and employees not in proximate relationship may be drawn into common controversies by economic forces,' and that the very disputes sought to be avoided might involve 'employees [who] are at times

was guilty of unfair practices. There is substantial evidence to sustain that determination. No extended outline of the evidence is useful here. Bach knew of this labor controversy between the two warring unions. It knew in taking over the delivery for Gluek that it would really determine that conflict. Such conscious interference was an unfair labor practice.

## II. Challenge of Particular Provisions of the Order.

 Besides urging the invalidity of the order of the Board as above examined, Gluek contends a portion of the affirmative relief under the order is, as construed by the Board, impossible of performance.[8] That portion of the order is: "Offer to the employees named in Appendix A, attached hereto, immediate and full reinstatement to their former positions as drivers and helpers, or to substantially equivalent positions for which they are qualified, or place them upon a preferential list of employment in accordance with the procedure set forth in the section of the Intermediate Report entitled 'The Remedy,' without prejudice to their seniority and other rights and privileges." The "procedure set forth," referred to in the preceding quotation is: "It will be recommended that the respondents offer to each of the employees named in footnote 1 above (excepting Dominic Hebzynski), immediate and full reinstatement to their former positions as drivers and helpers or substantially equivalent positions, and fully restore to them all rights and privileges enjoyed by them as acknowledged employees of the respondent Gluek prior to December 5, 1941, and, if necessary, discharge any or all of the drivers and helpers employed by the respondent Bach for the purpose of delivering the respondent Gluek's products, with the exception of the five employees named in footnote 2 above. In the event that a sufficient number of positions are not available, after the discharge of the employees above described, to which reinstatement may be made, it will be recommended that employees for whom such reinstatement is now unavailable shall be placed upon a preferential list for employment and shall be reinstated to their former or to substantially equivalent positions when such employment becomes available and before any persons with less seniority are hired for such work."

Gluek construes this part of the order as giving it three alternative lines of action as follows: (1) Offering immediate and full reinstatement to former positions as drivers and helpers; (2) offering substantially equivalent positions for which they are qualified; (3) placing on a preferential employment list. It states, however, that it has been advised by the Board that these alternatives do not exist but that "it must first offer these men their positions as drivers and helpers, and in that connection, it must see to it that the employees

---

brought into an economic relationship with employers who are not their employers.' In this light, the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' 'employer,' and 'labor dispute,' leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications. Cf. National Labor Relations Board v. Blount, supra.

"Hence 'technical concepts pertinent to an employer's legal responsibility to third persons for the acts of his servants' have been rejected in various applications of this Act both here (International Association of Machinists v. National Labor Relations Board, 311 U. S. 72, 80, 81, 61 S.Ct. 83, 88, 89, 85 L.Ed. 50; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 520, 521, 61 S.Ct. 320, 323, 85 L.Ed. 309) and in other federal courts (National Labor Relations Board v. Condenser Corporation of America, 3 Cir., 128 F.2d 67; North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 109 F.2d 76, 82; National Labor Relations Board v. Blount, supra). There is no good reason for invoking them to restrict the scope of the term 'employee' sought to be done in this case. That term, like other provisions, must be understood with reference to the purpose of the Act and the facts involved in the economic relationship. 'Where all the conditions of the relation require protection, protection ought to be given'". National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851.

[8] It would seem that this kind of issue may be determined either in an enforcement proceeding or in a contempt proceeding after enforcement order (see Southport Petroleum Co. v. National Labor Relations Board, 315 U.S. 100, 106, 107, 62 S.Ct. 452, 86 L.Ed. 718).

of the Bach Transfer Company * * * must be discharged and room made for the men to whom the offer is to be made."

It argues the impossibility of compliance with the order as follows:

"(a) It cannot discharge employees of Bach, because they are Bach's employees, not Gluek's.

"(b) It cannot offer reinstatement of positions of drivers and helpers because it has no such positions.

"(c) It cannot create such positions because it cannot obtain trucks; its trucks have been sold; they belong to someone else; trucks are not now available."

Countering, the Board states: "The Board moulded its remedy to avoid hardship and required neither the elimination of the arrangement with Bach nor the expansion of the delivery operations to their former scope in order to provide work for the members of the displaced Brewers. Even if the restoration of the bargaining rights of the Brewers be undertaken within the framework of present delivery arrangements, as the Board's order permits, no basic dislocation of relationship or marketing structure would result." Further, "respondent Gluek's objection to the order upon the asserted ground that it has no drivers' jobs to be filled or trucks to be driven amounts to a contention that the sanctions of the Act should be withheld from conduct precisely because it is successful. Indeed the Supreme Court said of a related contention that it presents no basis for 'relief from the Board's order of reinstatement; instead there is added ground for compelling obedience'. Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718."

■■■■ Determination of the form of remedy to rectify unfair labor practices is peculiarly a function for the Board (Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 539, 63 S.Ct. 1214, 87 L.Ed. 1568; International Assoc. of M. T. & D. M. v. National Labor Relations Board, 311 U.S. 72, 82, 61 S.Ct. 83, 85 L.Ed. 50; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 600, 61 S.Ct. 358, 85 L.Ed. 368) and will be upheld if within its powers and not arbitrary or capricious (National Labor Relations Board v. Mackay R. & T. Co., 304 U.S. 333, 348, 58 S.Ct. 904, 82 L.Ed. 1381). We cannot say that this part of the order of the Board was without its

powers or was either arbitrary or capricious. The order covers both companies. Under the evidence as to their relations with each other, it should not be impossible for them to work out the intent of the order.

Gluek argues also the impossibility of its ceasing and desisting from giving effect to a closed shop contract between Bach and Local No. 792. The order is against both Gluek and Bach "jointly and severally." They are so to act as to nullify the unlawful situation created by them. It may be that some things must be done by one and other things by the other. It is left to them, jointly or severally, to work out the ways to comply with the order.

■■■■ Gluek objects to that part of the order reading "In any other manner interfering with, restraining, or coercing their employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act." The assigned reason is there is no warrant therefor in the violations charged or in the evidence. This objection is well taken. (National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930). The same objection applies to the closing expression in 1(a) of the order reading "or in any other manner discriminating in regard to their hire or tenure of employment or any term or condition of their employment."

■■■■ Gluek contests that part of the order which is directed not only at the respondents and their officers and agents but also their "successors and assigns." This form of order is proper. Southport Petroleum Co. v. National Labor Relations Board, 315 U.S. 100, 106 note 6, 62 S.Ct. 452, 86 L.Ed. 718. If a "successor" or an "assign" should be involved in a contempt proceeding for violation of the enforcement order of this Court, those terms will be construed and applied to avoid punishment of the innocent. See National Labor Relations Board v. Bachelder, 7 Cir., 125 F.2d 387, 388; National Labor Relations Board v. Blackstone Mfg. Co., 2 Cir., 123 F.2d 633, 635; Bethlehem Steel Co. v. National Labor Relations Board, 74 App.D.C. 52, 120 F.2d 641, 650, 651.

With the modifications hereinbefore stated (elimination of the quoted language in 1(a) and the elimination of 1(c)), the order of the Board will be enforced.

Before closing this opinion, it is proper to comment upon statements[9] in the brief of intervener Local No. 792. Such statements serve notice upon this Court—if, indeed, they do not amount to threats—that this intervener will disregard any decision of the Board and of this Court upholding the Board and will exercise what it calls its constitutional rights to render the order of the Board and the order of this Court ineffective. Such character of statement in a brief is as impertinent as it is frank. It has no place in the brief of any responsible counsel in this or any court.

However, the weight of this matter is not so much in the circumstance that the statements were improper. The gravity is in the situation that a labor union deems it has the uncontrollable power to disregard and to nullify a determination of the Labor Board and an order of a court sustaining the Board. It may have such power or it may not. This is neither the time nor place to determine that. Such problem will become acute only if the threat ripens into action and something must be done in a contempt or other proceeding.

If this power does not exist, the statute law should be made clear. If it does exist, there is even more necessity for remedying a situation where any person or body of persons in this country is above the law as declared by the Congress.

The grave purpose of Congress in passing this Act was to provide the means for protecting the rights of labor to organize. The Act defines those rights and sets up the machinery to effectuate such protection. Here is an employer who is friendly to organized labor and has, for years, operated a closed shop business. This situation is expressly protected in the Act itself, § 8(3). A rival labor organization seeks to change the affiliation of some of those employees and, being unsuccessful in its endeavors, brings such economic pressure upon the employer that, to save itself from seriously threatened ruin, it breaks its closed shop agreement and violates the Act itself. The Board determines the unfair practices violating the Act and orders them rectified. This Court orders enforcement of the order. The loser before the Board and the Court says it will not abide by the result of the orderly determination in the manner required by Congress. It will destroy the innocent employer and put its organized employees upon the street. If nothing can be done, in an orderly way under existing law, to prevent this, then there is a vital defect in the powers of the Board or of the Courts because they are unable to effectuate the purpose of Congress "to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and con-

---

[9] Those statements are as follows: "The decision and order of the Board has placed the Gluek Brewing Company in the unhappy and impossible situation of resuming a delivery operation (assuming it can buy equipment—the Board order does not attempt nor can it legally set aside the sale of equipment to the Bach Company) which is doomed to failure by virtue of the completely justifiable position of the American Federation of Labor in insisting that its affiliates respect jurisdictional lines. We say that the delivery operation is doomed to failure because until and unless the delivery operations of the Gluek Brewing Company are carried on by members of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, the affiliates of that organization in the exercise of their right of free speech guaranteed by the Fourteenth Amendment to the Constitution of the United States, and by virtue of the loyalty and support of its members, and the members of other organizations affiliated with the American Federation of Labor, will effectively curtail the consumption of Gluek beer in the protection of the interests and standards of its members.

"The delivery employees of the Gluek Brewing Company have the absolute right to determine for themselves whether they choose to be represented by Local 205 or Local 792. But Local 792 also has the absolute right to express its dissatisfaction with a designation of Local 205, and to call upon its members, friends, and sympathizers not to patronize or provide employment for the members of Local 205."

ditions of their employment or other mutual aid or protection" Act § 1, 29 U.S. C.A. § 151.

JOHNSEN, Circuit Judge (concurring).

I concur in the decision and the reasons given therefor. As to the closing observations of the opinion, the statements made by Intervener Brewery and Beverage Drivers, etc. Local 792, of what the Union will or won't do in the situation created by the Board's order, might warrant us in striking its brief for impertinence on the legal issues now before us, but that is as far as I feel that we should or can go in expression at the present time. I prefer to wait to deal with the apparently lurking question until it arises before us.