**M AND M WOOD WORKING CO. et al. v.
NATIONAL LABOR RELATIONS
BOARD.**

**No. 8854.**

Circuit Court of Appeals, Ninth Circuit.

Feb. 17, 1939.

HEALY, Circuit Judge, dissenting.

Malarkey, Sabin & Herbring, Dan J.
Malarkey, Robert L. Sabin, Jr., Neil Ma-

larkey, Karl Herbring, and Samuel H. Martin, all of Portland, Or., for petitioner M and M Wood Working Co.

Hugh K. McKevitt and Jack Howard, both of San Francisco, Cal., for petitioner Plywood & Veneer Workers' Union, etc.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate General Counsel, Laurence A. Knapp, Mortimer B. Wolf, Julius Schlezinger, and Bertram Edises, Attys., National Labor Relations Board, all of Washington, D. C., and John T. McTernan, of San Francisco, Cal., for respondent.

Before WILBUR, MATHEWS, and HEALY, Circuit Judges.

MATHEWS, Circuit Judge.

The M and M Wood Working Company, an Oregon corporation (hereafter called the Company),[1] and Plywood & Veneer Workers' Union, Local No. 2531, a labor organization (hereafter called Local No. 2531),[2] have petitioned this court to review and set aside an order of the National Labor Relations Board dated April 1, 1938, requiring the Company to cease and desist from certain practices in which the Board found the Company had engaged and was engaging, and which the Board held were unfair labor practices, within the meaning of § 8 of the National Labor Relations Act, 49 Stat. 452, 29 U.S.C.A. § 158.

The question is whether the Board's findings are supported by evidence.

The Board found that the Company had interfered with, restrained and coerced and, at the time of the order, was interfering with, restraining and coercing its employees in the exercise of the rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, and thus had engaged and was engaging in unfair labor practices, within the meaning of § 8 (1) of the Act; and that, by discrimination in regard to hire and tenure of employment, the Company had encouraged and, at the time of the order, was encouraging membership in Local No. 2531, had discouraged and was discouraging membership in Plywood & Veneer Workers' Union, Local No. 102,

a labor organization (hereafter called Local No. 102),[3] and thus had engaged and was engaging in unfair labor practices, within the meaning of § 8 (3) of the Act. These are the practices from which the Board ordered the Company to cease and desist.

Section 7 of the Act provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Section 8 of the Act provides: "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title].

*　*　*　*　*　*

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act [chapter], * * * or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act [chapter] as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9(a) [section 159(a) of this title], in the appropriate collective bargaining unit covered by such agreement when made."

Section 9(a) of the Act, 29 U.S.C.A. § 159(a), provides: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment * * *."

---

[1] The Company has a department or division called the Plylock Corporation, and is itself sometimes called by that name.

[2] Local No. 2531 is affiliated with the United Brotherhood of Carpenters and Joiners of America, which is affiliated with the American Federation of Labor.

[3] Local No. 102 is affiliated with the International Woodworkers of America, which is affiliated with the Congress for Industrial Organization.

There is no evidence that the Company ever interfered with, restrained or coerced any employee in the exercise of any right guaranteed in § 7 of the Act. Hence, the Board's finding that the Company had engaged and was engaging in unfair labor practices, within the meaning of § 8 (1) of the Act, is not supported by evidence.

There is no evidence that the Company ever discriminated in regard to hire or tenure of employment, except in pursuance of and in conformity with a closed shop agreement which it made with Local No. 2531 on, or as of, May 3, 1937. Pertinent portions of the agreement were as follows:

"The parties to this agreement are the Plylock Corporation,[4] hereinafter known as the Company, and Plywood & Veneer Workers' Union No. 2531, affiliated with the United Brotherhood of Carpenters and Joiners, hereinafter known as the Union.

"The Company recognizes the fact that all its employees are members of the Union. The Company recognizes the Union as representing, for the purpose of collective bargining, all of its employees except those acting as shift foreman and in the plant office and not paid on an hourly basis not at present in the Union, or any replacement of such personnel. It is the desire of the parties hereto that the employees covered by this agreement shall maintain membership in good standing in the Union. In order that this desire may be effectuated, and in order that the Union may discipline its members for the effective operation of this agreement, the Company agrees to release from its employ any person who fails or refuses to maintain membership in good standing in the Union." * * *

"The Company agrees to give preference to members of the Union in all employment which may be made available whenever a new job becomes available. Should a vacancy occur after the list of Union members has been exhausted, the Company will notify the Union and the latter shall send an employee competent and qualified to perform the work required; it being understood that such new employee must be satisfactory to the Company. In the event that the Union is unable to furnish satisfactory, reasonably competent and qualified help then the Company shall be free to obtain workmen in any manner it sees fit.

"It is understood, however, that in the latter eventuality, such employee shall secure a temporary working card from the Union. If the Union deems such person suitable as a prospective member of the Union, such person shall within thirty (30) days after his employment become a member of the Union. If such person is found unsuitable for Union membership the Company agrees to release him from employment. * * *"

"The duration of this agreement shall be from May 3rd, 1937 to March 1st, 1938. * * *"

■ There is no finding, nor any evidence which would have warranted a finding, that the union (Local No. 2531) mentioned in the agreement was established, maintained or assisted by any action defined in the Act as an unfair labor practice. That this union was the representative of the Company's employees, as provided in § 9 (a) of the Act, in the proper bargaining unit covered by the agreement when made, is conceded. Thus, it is seen, the agreement was in conformity with § 8 (3) of the Act and was a lawful and proper agreement.

■ While the agreement was in force —from May 3, 1937, to March 1, 1938— the Company complied with it. In that way and to that extent only, it discriminated in favor of those who were, and against those who were not, members of Local No. 2531. If thereby it encouraged membership in Local No. 2531 or discouraged membership in Local No. 102, such encouragement or discouragement did not constitute an unfair labor practice, within the meaning of § 8 (3) of the Act.

The Board found that on September 12, 1937, the union (Local No. 2531) mentioned in the agreement withdrew from and severed its affiliation with the United Brotherhood of Carpenters and Joiners of America (hereafter called the Brotherhood), and became Local No. 102, affiliated with the International Woodworkers of America (hereafter called the International); that thereupon Local No. 102 succeeded to the rights of the union mentioned in the agreement, or else the agreement was thereby terminated and was no longer in force; that on September 27, 1938, a

---

4 See footnote 1.

new Local No. 2531 was organized; that, although it had the same name and number, the new local was not the union mentioned in the agreement; that the Company had discriminated and was discriminating in favor of the new local's members; and that such discrimination was not in pursuance of or in conformity with the agreement.

These findings are not supported by evidence. On the contrary, the evidence establishes, without conflict, the following facts:

▓▓▓ Local No. 2531 was organized on or prior to April 11, 1935. On or about that date it applied for and obtained a charter from the Brotherhood. Then, as now, Article I of its constitution provided: "This organization shall be known as the Plywood & Veneer Workers' Union Local No. 2531 and shall be affiliated with the United Brotherhood of Carpenters and Joiners of America." Hence, for Local No. 2531 to withdraw from or sever its affiliation with the Brotherhood would have required an amendment to its. constitution. Article XI of its constitution provided: "This Constitution may be amended by a two-thirds vote of the members present at any regular meeting, providing the amendment has been presented in writing and filed with the secretary two weeks prior to the meeting at which the vote is taken." There is no evidence that any amendment to the constitution of Local No. 2531 was ever presented, filed, voted on or adopted.

In accepting its charter, Local No. 2531 agreed to conform to the Brotherhood's rules and regulations,[5] one of which (General Laws, § 25) provided: "A local Union cannot withdraw from the United Brotherhood or dissolve so long as ten members in good standing object thereto. * * *" Thus, even though a withdrawal amendment had been presented and filed and had been voted for by two-thirds of the members, still, if ten members had objected, the amendment would have been defeated. Since, however, no such amendment was ever presented, filed or voted on, we need not consider what number of votes would have been necessary to adopt it. It suffices to say that no such amendment was adopted, and that, therefore,

Local No. 2531 never withdrew from or severed its affiliation with the Brotherhood. Much less did it become Local No. 102, affiliated with the International.

▓▓▓ On or about September 12, 1937, a majority of the members, including all the officers, of Local No. 2531 withdrew from that local and· organized Local No. 102, a wholly new and previously non-existent organization. Assuming, apparently, that by their withdrawal they had dissolved Local No. 2531, the officers returned its charter to the Brotherhood. The assumption was baseless. Local No. 2531 had 39 members who did not withdraw from it and did not join Local No. 102. Thus, it is seen, there were more than ten members who never consented to a dissolution of Local No. 2531. Nor did the Brotherhood —of which Local No. 2531 was a unit— consent to such dissolution. Instead, it returned the charter and, on or about September 27, 1937, new officers were elected to succeed those who had withdrawn.

The Board speaks of this election as a "reorganization" and assumes that thereby a new organization was created. The assumption is erroneous. Local No. 2531 mentioned in the charter, Local No. 2531 mentioned in the agreement, and Local No. 2531 mentioned in the Board's order are one and the same organization. There was and is no new Local No. 2531.

▓▓▓ On or shortly after September 12, 1937, Local No. 102 demanded that the Company give employment to its members, notwithstanding their failure and refusal to maintain membership in Local No. 2531. Thus, in effect, Local No. 102 demanded that the Company violate the agreement of May 3, 1937. Local No. 2531 demanded that the Company continue to comply with the agreement. The Company ·did so continue. Thereupon Local No. 102 filed charges with the Board, and the Board issued its complaint against the Company. Local No. 2531 was permitted to intervene. After hearings before a trial examiner and before the Board in January, 1938, the Board on April 1, 1938, made the order now under review.

Meanwhile, on March 1, 1938, the agreement had expired, and all discrimination by the Company in favor of the mem-

---

5 The charter declares: "It is hereby agreed in the acceptance of this Charter, that [Local No. 2531] shall conform to

the [Brotherhood's] Constitution, Rules and Regulations. * * *"

bers of Local No. 2531 had ceased.[6] The Board's finding that such discrimination was being practiced at the time of the order is, admittedly, contrary to the fact.

Being based on findings which are not supported by evidence, the Board's order must be, and it is hereby, set aside.

HEALY, Circuit Judge (dissenting).

I am unable to agree that the findings of the Board are unsupported by evidence or that the order should be set aside.

The case grows out of a jurisdictional dispute between rival labor organizations and presents a perplexing problem in the field of industrial relations. In the main the facts are not in controversy, although diverse inferences may be drawn from them and they did and do give rise to conflicting interpretations. I think a more adequate statement of them than made in the majority opinion is essential to any fair appraisal of the order.

The petitioner, M & M Wood Working Company, manufactures wood products.[1] It has three plants, two in Portland and one at Longview in the state of Washington. One of the Portland plants is operated by a subsidiary known as the Plylock Corporation. Only the latter plant is involved in this proceeding and it will be referred to as the Plylock plant.

Organization among employees at the Plylock plant began as early as 1934, at which time a union was formed, affiliating with the American Federation of Labor as Federal Local No. 19487. Within a short time practically all the workers at the plant became members of the local. In 1935 the American Federation of Labor granted to the United Brotherhood of Carpenters and Joiners of America, which will be referred to as the Carpenters' Union, jurisdiction over all woodworkers. Federal Local No. 19487 then became Local No. 2531 of the Carpenters Union.

In 1936 Local No. 2531 of the Carpenters Union, referred to by the Board as the Plylock Local, made a contract with the employer concerning hours, wages, and other conditions of employment. The contract recognized the Local as the bargaining agency for its members. In May, 1937 a new contract was entered into between the Plylock Local and the petitioner,[2] to run until March 1, 1938. The contract contained a closed shop provision requiring the petitioner to employ only members of the Local in good standing.

Soon after this contract was made a movement got under way within the Local looking toward a termination of its connection with the Carpenters Union and an affiliation with the Committee for Industrial Organization. In July a secret ballot was taken in which 89% of the votes cast by the members of the Plylock Local were in favor of affiliation with the CIO. In August the petitioner was informed that the employees at its plant were in favor of such affiliation and that the Plylock Local intended installing an I.W.A. charter.[3] Although raising no objection at the time, petitioner shortly became disturbed because of word from its customers that the Carpenters Union was threatening a boycott in the event the switch were made.

On August 31 a meeting of the employees was addressed by representatives of the Carpenters Union and the I. W. A. After hearing both sides the members of the Local voted overwhelmingly in favor of the I. W. A. affiliation. Next day petitioner received a wire from an official of the Carpenters Union to the effect that a boycott had been placed on its products by that Union. Petitioner thereupon informed the executive committee of the Local that it would be unable to operate in the face of such a boycott; also, that under the terms of the existing contract it could not employ workers who failed to retain membership in good standing in Local No. 2531 of the Carpenters Union. On September 8 petitioner shut down its plant and advised the Local that it would not reopen until the latter definitely determined its position relative to affiliation.

On September 9 the Local formally voted to install an I. W. A. charter on the

6 It was so stated and admitted in argument before this court.

1 In the ensuing narrative free use is made of the verbiage of the Board's findings. The bulk of the evidence on which the findings were based was taken before a special master appointed by Judge Fee of the United States District Court for Oregon in the case of M & M Wood

Working Co. v. Plywood, etc., Union No. 102, reported in 23 F.Supp. 11.

2 M & M Wood Working Company, the employer, will in the interest of brevity be referred to as petitioner.

3 During July, 1937 the CIO set up the I.W.A. (International Wood Workers of America) as an international union composed of workers in the lumber industry.

following Sunday, September 12. The September 12 meeting which followed was attended by about 450 of the Local's 500 members. A motion to close the Local's affiliation with the Carpenters Union was adopted with but one dissenting vote. A motion to install an I. W. A. charter was adopted with but seven dissenting votes. Thereupon the new charter was installed, in which the organization was described as Local No. 102 of the I. W. A. By motion the officers of Local No. 2531 were retained as officers of Local No. 102.

After the meeting the charter of Local No. 2531 was mailed to the Carpenters Union at its national offices at Indianapolis. Upon its receipt there it appears to have been forwarded to a representative of the Carpenters Union in Portland, who disposed of it in a manner presently to appear.

At the meeting of September 12 a resolution was adopted declaring the intention of the Local to carry out under its new name the provisions of the contract with petitioner. A copy of this resolution was presented to the petitioner with the request that it be attached to the latter's copy of the contract.

In the two weeks following the meeting of September 12 futile conferences were held between the petitioner and the executive committee of Local No. 102. Meantime one Dodge, the sole member of the Plylock Local who had voted against the termination of the affiliation with the Carpenters Union, made efforts in the direction of reorganizing Local No. 2531. He was assisted in this by one Sleeman, the representative of the Carpenters Union in Portland, to whom the surrendered charter had been forwarded from the Indianapolis office. The petitioner itself aided and encouraged the movement. About September 21 Dodge informed petitioner that he had forty or fifty Plylock employees who were willing to return to work as members of Local No. 2531 of the Carpenters Union. Petitioner then mailed to each of its employees whose name was on its roll as of September 8 a notice stating that petitioner intended to reopen its plant with members of Local No. 2531 and that it was requesting such Local to advise it as to which workers were members in good standing.

About the same time, Dodge and three others sent out cards to 248 of the employees announcing a meeting on September 25.[4] Thirty-one persons, of whom two left, were present at this meeting. Temporary officers were appointed by Sleeman (the Carpenters Union representative) and the group decided to "reorganize" Local No. 2531.[5] At a meeting of this group two days later a new oath of allegiance to the Carpenters Union was administered to those present. About October 1 Sleeman presented the surrendered charter of Local No. 2531 to the business agent of what the Board terms "New Local No. 2531."

On October 6 the plant reopened with about fifty men supplied by the new Local No. 2531. Thereupon Local No. 102 picketed the plant and forced it to close again. Under heavy police protection the plant reopened for the second time on October 14. A complaint was then filed with the Board by Local No. 102, charging petitioner with unfair labor practices within the meaning of § 8 (1) and (3) of the act, 29 U.S.C.A. § 158 (1, 3). In the hearing before the Board the new Local No. 2531 of the Carpenters Union was permitted to intervene and was represented by counsel.

The Board found that "the constitution of the Carpenters Union expressly contemplated that local unions could withdraw from affiliation; that the Plylock Local followed the correct legal procedure and did so withdraw; and that this being so, Local No. 2531, as affiliated with the Carpenters Union, ceased to exist and New Local No. 2531 cannot be considered as the same organization." It found that petitioner's refusal to retain at work, after September 12, 1937, employees who failed to maintain membership in good standing in the new Local No. 2531 of the Carpenters Union constituted discrimination against its employees in regard to hire and tenure of employment; that petitioner had interfered with, restrained and coerced its employees in the exercise of their guaranteed rights; and that its conduct amounted to unlawful discrimination. It concluded that petitioner had engaged and is en-

---

4 The notice was signed by Sleeman, the Brotherhood representative. It stated that the employer had "called upon the United Brotherhood to advise which men are qualified to work." It ended with the admonition—"Be sure to attend this meeting if you want to work."

5 The word "reorganize" is the descriptive term used by Dodge himself.

gaging in unfair labor practices within the meaning of § 8 (1) and (3) of the act.

In making its order, the Board recognized that petitioner had acted in good faith under the belief that it was by its contract required to deny these men employment. No back pay was granted, but since the discharge of the employees was found to have been an unfair labor practice the petitioner was directed, upon application, to offer to these employees reinstatement to their former positions, without prejudice to their seniority and other rights or privileges.

It was for the Board to determine the facts and to draw inferences from them. Consolidated Edison Co. of New York v. National Labor Relations Board, 59 S.Ct. 206, 83 L.Ed. ——, Dec. 5, 1938; National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193. I think its findings and order in this instance are adequately supported by the record.

In respect of the matter of withdrawal, the constitution of the Carpenters Union provides: "A local union cannot withdraw from the United Brotherhood or dissolve so long as ten members in good standing object thereto." It was urged in the briefs that the provision is for the benefit of the Carpenters Union and may be waived by it. The position, I think, is untenable. The regulation recognizes that the right of withdrawal exists, and that the veto of its exercise rests, not in the Brotherhood, but in the Local's own members. While the majority opinion does not mention the matter, presumably petitioners' contention in this respect has been rejected.

The obverse of the quoted provision is that a local union may withdraw unless ten or more of its members object. It is a reasonable implication that the objection, unless it is by some means suppressed or is given no fair opportunity of expression, must be made manifest in some way having recognition in familiar parliamentary practices. At the least, the objectors, if there are any, must act with the degree of diligence and formality expected of men in the conduct of their ordinary affairs. Otherwise a Local, having the right to withdraw from the parent union and desirous of exercising it, could not with certainty determine its status.

Here the action was had after debate running through weeks of time. It was taken at a formal meeting held for that purpose, of the holding of which every member had knowledge. About 90% of the members were present and there was but one vote in opposition to the formal motion. There is no evidence of fraud or oppressive tactics and no claim of that sort is made. The severance of the relationship would seem to have been complete upon surrender of the charter. Certainly the members of the Local intended to sever its relationship and thought they had done so.

The majority view is that the withdrawal could not be effected without amending the Local's constitution. Hence, since it was not shown that there was an amendment, there was no withdrawal, and Local No. 2531 continued as an affiliate of the Carpenters Union.

I believe this view has little to recommend it. There is nothing in the constitution of the Local which provides for withdrawal from the affiliation or. which prescribes the method by which withdrawal may be effected. The instrument does not deal with the subject at all, and it is plain that an amendment of it would not accomplish the desired purpose. Amendment of the Local's constitution required only a two-thirds vote of the members present; whereas, if regard be had to the governing rule of the parent union, an amendment by the specified vote would be ineffective as a withdrawal.

Neither the constitution of the Carpenters Union nor the charter issued by it requires action of this sort as a condition of withdrawal. And in this instance these instruments are controlling. The adoption of the formal resolution, with but one dissent, and the surrender of the charter, were self-operative acts. An amendment of the constitution of the local body to conform to the fact would in such case become a matter of purely internal concern.

It is conceded that the Carpenters Union was not a party to the subsisting contract. The Local set up by Dodge in the latter part of September as an affiliate of the Carpenters Union, although it bore the same name, was determined, on sufficient evidence, not to be the same entity as Local No. 2531, which had withdrawn from the affiliation two weeks earlier. The "Union" referred to in the closed shop provision of the contract was thus neither the Carpenters Union nor the newly established Local. Yet petitioner looked to the latter organization for its list of eligi-

ble employees, excluding all others from its plant. And it confessedly lent aid and comfort to those who undertook to set up the later organization and to make of it a going concern. Under these circumstances I think the closed shop agreement affords the petitioner no sanctuary.

The Board thought it unnecessary to decide whether the contract remained in force with the Plylock Local after its change in name and affiliation. Once it had been found as a fact that the Local organized under the leadership of Dodge and Sleeman had no identity with Local No. 2531, with which petitioner had made the contract, the point became immaterial. The present proceeding is not one to enforce a closed shop contract. It seems plain enough that an employer, who has agreed to employ only members of an existing labor union, does not escape an infraction of the act by refusing to employ others than the members of a different and un-representative union thereafter organized.

No doubt the handful of members of the old Local who failed to affiliate with Local No. 102 of the CIO, however small their number, were free to remain aloof or to organize another union if they saw fit and to make such affiliation as they might. It is certain, however, that this group did not have and were unable to seize anything approaching effective leadership among the employees. In these circumstances, even though the union they organized be thought identical with the original Plylock Local I doubt whether the closed shop agreement with the latter would continue enforceable. The point is suggested, only, since neither the Board nor the majority of the court have discussed it and counsel did not argue it. I think, however, that the question is not foreclosed by the proviso in § 8 (3) of the Wagner Act, 29 U.S. C.A. § 8 (3).

As is well known, employers and the public alike are made to suffer in these fratricidal conflicts. The Carpenters Union boycott, declared some days in advance of the formal severance of the Local's affiliation, was like a pistol pointed at the heads both of the petitioner and its employees. But as this court said in National Labor Relations Board v. Star Publishing Co., 9 Cir., 97 F.2d 465, 470, "the act prohibits unfair labor practices in all cases. It permits no immunity because the employer may think that the exigencies of the moment require infraction of the statute."

Congress has clothed the Board with authority and has imposed on it the duty of deciding these controversies, destructive as they are of industrial peace. It was the hard task of the Board to decide this one, and I think it has done so in a rational way. No penalty was imposed on the petitioner. Those who were its employees at the time of the closure of its plant remained such under the statutory definition. § 2, (3), (8), (9), 29 U.S.C.A. § 152 (3, 8, 9). Reinstatement in their jobs on request, without loss of seniority, but without back pay, was not a harsh or unreasonable requirement and seems fairly designed to effectuate the policy of the act. Nor was the cease and desist order unreasonable or unwarranted, as the majority seems to hold. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838.