**HARBOR CARRIERS OF the PORT OF NEW YORK and Its Members, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**GALLAGHER BROS. SAND & GRAVEL CORP., Bilkay Holding Corp., Hampton Scows, Inc., Neptune Line, Inc., and Rockville Scows, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Charles J. KING and Deck Scow Captains Local 335, United Marine Division, National Maritime Union, AFL-CIO, Respondents.**

Nos. 389–391, Docket 27544, 27550, 27560.

United States Court of Appeals
Second Circuit.

Argued June 14, 1962.

Decided July 31, 1962.

**90**

Roman Beck of Krisel, Beck & Taylor, New York City (Arthur Karger, New York City, of counsel, on the brief), for petitioners Harbor Carriers of the Port of New York.

Christopher E. Heckman of Foley & Martin, New York City (James S. Reardon, New York City, of counsel, on the brief), for petitioners Gallagher Bros. Sand & Gravel Corp., Bilkay Holding Corp., Hampton Scows, Inc., Neptune Line, Inc., and Rockville Scows, Inc.

Richard L. Newman of Kanner, Hannan & Newman, New York City (William J. Hannan, New York City, of counsel, on the brief), for respondent Deck Scow Captains, Local 335, United Marine Division, National Maritime Union, AFL–CIO.

Melvin J. Welles, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Atty., Washington, D. C., on the brief), for petitioner-respondent National Labor Relations Board.

Howard Schulman, New York City, for Intervenor, Deck Scow Captains, Local 335, Independent.

Before FRIENDLY, KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge.

The petitioners, an employers' association and certain individual employers, seek review of orders entered against them by the National Labor Relations Board and based upon that Board's finding of violations of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. We hold that the orders must be set aside.

For a number of years the employers have had collective bargaining agreements with Deck Scow Captains Local 335, United Marine Division, National Maritime Union, AFL–CIO, as representatives of their employees working on scows.[1] The most recent of these agreements was executed in 1959 for a period to end on March 31, 1961.

1. As each scow has only one employee there is no question of the scow captains being "supervisors" and thus exempted from the operation of the Act. § 14(a), 29 U.S.C.A. § 164(a).

At a membership meeting of Local 335 held on May 15, 1960, a motion was adopted providing for a special meeting to be held on May 29, 1960 for the purpose of discussing the disaffiliation of Local 335 from the United Marine Division of the National Maritime Union.

At the meeting which was held on May 29 "about" 130 of those in attendance voted for disaffiliation and "about" 14 against. The Local had at that time approximately 750 members.

In the meantime on May 20 the United Marine Division designated a "temporary administrator" of the affairs of Local 335 and wrote to the employers advising them to deal with the administrator on all matters concerning the collective agreement. This same advice was repeated in response to a telephone call from an employer representative on May 27 or shortly thereafter. In fact at all times since these dates representatives claiming to act for Local 335, United Marine Division, have continued to demand that the employers observe the terms of the collective agreement. The employers, on their side, have acceded to these demands and have recognized and dealt with that Local.

After the disaffiliation vote of May 29, representatives claiming to act for "Local 335, Independent" also wrote to the employers informing them of the action which had been taken and from time to time thereafter demanded that the employers deal with that Local. The employers refused to do so and continued to bargain with Local 335, United Marine Division.

It is the employers' refusal to deal with Local 335, Independent, which is the gravamen of the Board's complaint. (Section 8(a) (5), 29 U.S.C.A. § 158(a) (5).) The other charges which the Board sustained, and the resulting orders, are all based upon the charge of refusal to bargain. Since if that charge falls the rest must follow, we shall deal only with the charge of refusal to bargain.

The employees involved were represented by Local 335, United Marine Division, prior to May, 1960 and the employers were required by the Act to bargain with that Local as the representative of their employees. The only means provided by the Act for effecting a change of representatives is through a Board-conducted election by secret ballot. Section 9(e), 29 U.S.C.A. § 159(e). It is apparently assumed by the Board, and we accept the assumption, that in the absence of such an election the employer was required to continue to bargain with the representatives "currently recognized." (Section 9(c) (1) (A), 29 U.S. C.A. § 159(c) (1) (A).)

The Board concedes the correctness of these propositions but seeks to escape their consequences by holding that Local 335, Independent, was a continuation of Local 335, United Marine Division, and that therefore no change in bargaining representatives took place. The decision thus turns entirely upon the correctness of the finding that Local 335, Independent, is, under a new name, the same organization as Local 335, United Marine Division.

Unless it is established that Local 335, Independent, is the same organization as Local 335, United Marine Division, the employers would be required by the Board's familiar contract bar doctrine [2] to continue to deal with Local 335, United Marine Division, during the period of the contracts with that organization.[3] Far from being required to recognize and bargain with Local 335, Independent, the employers would commit an unfair labor practice if they did so while the contracts with Local 335, United Marine Division, were still in

---

2. For a discussion of the contract bar doctrine, including a consideration of legislative history, see Judge Friendly's opinion in Local 1545, United Bhd. of Carpenters v. Vincent, 286 F.2d 127 (2d Cir. 1960).

3. The contract bar doctrine applies although the union involved is not certified by the Board. See Asplundh Tree Expert Co., 92 N.L.R.B. 1013 (1950); United States Time Corp., 79 N.L.R.B. 1135 (1948).

force. And this would be true even if there was evidence which clearly established that Local 335, United Marine Division, had been repudiated by a majority of the employees and that a majority wished to be represented by Local 335, Independent.[4] Thus the issue in the present case is not whether a majority of the employees wished to have Local 335, Independent, rather than Local 335, United Marine Division, as their representative. Even if the evidence could be said to establish that they did, the employers would still have been required to bargain with Local 335, United Marine Division.

■■ It is true that the Board claims that the application or waiver of the contract bar rule is a matter of discretion for the Board to determine and that it "may be applied or waived as the facts in a given case may require in the interests of effectuating the policies of the Act"[5] and that this position has been approved by the courts.[6] In the present case the Board did not purport to waive the contract bar rule, nor is there any indication that such a waiver would effectuate the policies of the Act. Moreover, the accepted significance of waiver of the contract bar rule is that an election will be held for the purpose of choosing between the old and a new representative, not that the employer will be guilty of an unfair labor practice for re-fusing to bargain with a new organization claiming the right to represent.[7] In fact it would be entirely arbitrary and unreasonable for the Board, waiving the contract bar rule for the purposes of this case, to hold the employers guilty of an unfair labor practice for bargaining with the union with which they had contracts and with which, therefore, they had every reason to believe that they were required to bargain.

■ But if, in spite of these considerations, it could be held that the Board exercised its discretion to waive the contract bar rule, the Board would still not be justified, absent an election, in finding the employers guilty of refusing to bargain with a new representative unless that finding was based upon evidence that the employers did not have a "good faith doubt" that the new organization represented a majority of the employees. N. L. R. B. v. Philamon Labs., 298 F.2d 176, 179 (2d Cir. 1962); N. L. R. B. v. Jackson Press, Inc., 201 F.2d 541, 544 (7th Cir. 1953). In the present case, not only did Local 335, Independent, fail to present any adequate evidence of majority representation, but there is no finding as to good faith since the Trial Examiner, whose findings, conclusions and recommendations were adopted by the Board, refused to pass upon that issue, stating that the employers' "motives or good faith are not material."

4. N. L. R. B. v. Marcus Trucking Co., 286 F.2d 583 (2d Cir. 1961). The same result has been reached under the one year certification rule, the purpose and effect of which are identical. See Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); Carpinteria Lemon Ass'n v. N. L. R. B., 240 F.2d 554 (9th Cir. 1956), cert. denied, 354 U.S. 909, 77 S.Ct. 1295, 1 L.Ed.2d 1427 (1957); N. L. R. B. v. Henry Heide, Inc., 219 F.2d 46 (2d Cir.), cert. denied, 349 U.S. 952, 75 S.Ct. 881, 99 L.Ed. 1277 (1955); N. L. R. B. v. Century Oxford Mfg. Corp., 140 F.2d 541 (2 Cir.), cert. denied, 323 U.S. 714, 65 S.Ct. 40, 89 L.Ed. 574 (1944).

5. Hershey Chocolate Co., 121 N.L.R.B. 901, 905 (1958). See Ford Motor Co., 95 N.L.R.B. 932, 934 (1951).

6. See N. L. R. B. v. Grace Co., 184 F. 2d 126, 129 (8th Cir. 1950); Local 1545, United Bhd. of Carpenters v. Vincent, 286 F.2d 127, 131 (2d Cir. 1960). But cf. Fay v. Douds, 172 F.2d 720, 724 (2d Cir. 1949) ("* * * we assume that the 'contract bar' is, as it were, written into the statute * * *").

7. See Mayer, A House Divided—The Schism Doctrine, 22 Ohio St.L.J. 154 (1961); Naumoff, An Analysis of the Contract Bar Doctrine, 7 Lab.L.J. 197, 227 (1956); Note, The Schism Doctrine, 45 Va.L.Rev. 211 (1959); Note Employee Repudiation of Bargaining Representatives: An Appraisal of Existing Restrictions, 66 Yale L.J. 223, 232 (1956), and numerous Board cases cited in these articles.

Thus it is clear that support for the Board's conclusion, if it has any basis in law, must rest solely and entirely on the finding that Local 335, Independent, was a continuation under a new name of Local 335, United Marine Division, and not a new organization claiming the right to represent the employees.

■■ In examining the evidence on which the Trial Examiner reached his conclusion, we will accept his premise that a mere change in a labor organization's name or affiliation will not serve to change the identity of that organization. If the members of Local 335, United Marine Division, merely determined to change the name of that organization and to disaffiliate from the United Marine Division there would be reasonable ground for holding that the new organization was only a continuation of the old and that the employers must continue to bargain with that organization. If, however, some of the members of the Local, even a majority of them,[8] decided to withdraw from the Local and to form a new organization, the employers, under the principles already discussed, would be required to continue to bargain with the organization with which they had contracted, at least until the Board ordered a new election, or, if the contract bar rule were "waived," until the new organization presented proof which would dispel any good faith doubt of its majority support.

What is the evidence on which the Trial Examiner relied as establishing that the Local continued as the same organization rather than that a new organization was formed by the withdrawal of some of the members of the old Local? The focal point is the vote at the meeting of May 29 together with subsequent "ratification." But the May 29 vote can establish at most only that "about" 130 members out of a total of about 750 wished to disaffiliate from the United Marine Division (and that "about" 14 did not).[9] Of this vote the Trial Examiner said:

"Taking into consideration the peculiar nature of the industry, as described above, and the facts as to the meeting of May 29, in particular, I conclude that the vote there taken was not, standing alone, fairly representative of the wishes of the majority of the local's members, a substantial portion of whom were in effect disenfranchised."

Keeping in mind that the issue is not whether a substantial part of the membership wished to withdraw from the Local and form a new organization, but whether the old organization merely changed its name and affiliation, what is to be said of the subsequent "ratification" of this disaffiliation vote? The Trial Examiner finds that the vote was ratified by "a substantial majority of the employees" by the fact that "approximately" 500 signed cards "accepting the affiliation of Local 335, Independent, with the S. I. U. [Seafarer's International Union]" and "an approximately equal number" signed up for strike duty in July.

On June 19, 1960 there was a membership meeting at which a vote was taken on affiliation with the Seafarer's International Union. The vote was 160 to 5 in favor of such affiliation. The evidence as to the "acceptance" of this affiliation was as follows:

"Q. Did you submit to the membership at large by means of any referendum the question of ratification of the acceptance of the SIU

---

8. Where only five percent of the members remained loyal to the old organization the Board held that the organization continued to be the bargaining representative. Montgomery Ward Co., 68 N.L.R.B. 369, 372, n. 3 (1946). See also Great Lakes Carbon Corp., 44 N.L.R.B. 70, 72, n. 1 (1942) (same where one-third of the members remained loyal).

9. In Hershey Chocolate Co., 121 N.L.R.B. 901 (1958), where the vote for disaffiliation was 829 to 1, the board did not recognize the new union as the successor to the old, but ordered an election to permit the employees to choose between the two organizations.

charter by mail ballot, to be specific? A. No. We didn't have no referendum. We had 500 cards that they signed to accept and stay in the SIU.

"Q. I thought you said you didn't issue new cards. A. That was the membership wished. If they wished to stay in the SIU.

"Q. Just explain that a little to me a little more fully. I don't understand.

"Trial Examiner: I am puzzled, too.

"Q. About these 500 cards. Who signed the cards? A. The membership.

"Q. Where were they signed? A. On barges. At the hall.

"Q. Who presented them for signature? A. The delegate. Myself and the Executive Board.

"Q. Were these cards; you say are all dated and signed after the affiliation? A. These cards are signed during the affiliation and why we were affiliated.

"Trial Examiner: When you say 'affiliation,' you mean after the issuance of the charter?

"Mr. Beck: Right."

Even if this rather informal evidence is to be accepted, and even if we were to assume that a vote of a majority to disaffiliate from one organization and to join another establishes that the new organization is a continuation of the old, there is no evidence whatever as to the form or content of the cards which the employees are alleged to have signed. Contrary to the finding of the Trial Examiner, the evidence establishes that the employees by signing the cards were not "ratifying" the vote on disaffiliation. The cards referred to a completely different matter, i. e., affiliation with the Seafarer's. For all that appears a large number of the signers may have preferred not to disaffiliate from the Unit-

ed Marine Division, but, if such disaffiliation was inevitable, then and only then to affiliate with the Seafarer's.[10]

The fact that "approximately" 500 employees signed up for strike duty in July is equally unconvincing as ratification of the disaffiliation vote taken two months before. The strike did not have as its object recognition or bargaining with the new organization but was occasioned by the discharge of some of the employees. Moreover, willingness to support such a strike could at best suggest majority support for the new organization. It does not tend to establish that the new organization is a continuation of the old.

Defection of officers and seizure of assets are by no means indications that the old organization is continued in the new. Officers are more likely to lead secession movements than are the rank and file, and it may well be that members are unduly influenced in their choice of whether to remain with the old organization or to join the secessionists by reason of the consideration of which group controls the assets. See Kearney & Trecker Corp. v. N. L. R. B., 210 F.2d 852, 857–58 (7th Cir.), cert. denied, 348 U.S. 824, 75 S.Ct. 38, 99 L.Ed. 649 (1954). In the present case, moreover, the president, vice-president and one of the trustees apparently did not join the secession but resigned their offices. Of the two paid officers, it appears that one remained loyal to the old union and was appointed administrator of its affairs, while the other associated himself with the new organization.

The procedure of disaffiliation did not accord with the requirements of the union constitution, but it is not necessary in this case for us to pass upon the Board's position that it will not consider in situations of this kind the legality of disaffiliation under the provisions of the union constitution. (See Hershey Chocolate Corp., 121 N.L.R.B. 901, 905–06 (1958); Radionic Prod. Div., 91 N.L.R.

---

10. Employees frequently sign authorization cards in more than one union. See Save Elec. Corp., 49 N.L.R.B. 1030, 1034 (1943).

B. 595 (1950); Brightwater Paper Co., 54 N.L.R.B. 1102, 1106 (1944). But see M & M Wood Working Co. v. N. L. R. B., 101 F.2d 938, 941 (9th Cir. 1939); Douglas and Lomason Co., 34 N.L.R.B. 69 (1941).) Even if the Board is right on this point, it seems clear that the withdrawal of members in the present case created a new organization.

The old organization did not disappear or become "defunct." It continued to function actively under the administration of one of its paid officials, who had been "discharged" by the new secretary-treasurer, the leader, apparently, of the secession movement. Promptly after the secession began it claimed to be the rightful holder of the contract and from its new headquarters it administered the contract to the extent it was permitted to do so.[11] So far as we can tell from the evidence it may have had the support of anywhere from 14 to over 600 of the members. Only an election could have resolved that question.

The court decisions cited by the Trial Examiner in support of the proposition that a mere change in name or affiliation does not change the identity of a contracting organization [12] are all distinguishable.[13] In none of these cases were there two unions claiming bargaining rights. In none of them was there any secession movement from an existing organization. In Carpinteria, the C.I.O. which had directly chartered the local involved suggested that it become a local of one of the CIO–affiliated internationals. The members voted unanimously to do so. In Harris-Woodson Co., the union was prevented from taking advantage of the Board's aid by the failure of the C. I.O. to file the then required affidavits. It thereupon changed its affiliation so that the employer could be ordered to bargain with it. (For the Board's own comment on the Harris-Woodson case, see quotation from Sears Roebuck & Co., 110 N.L.R.B. 226 (1954), *infra*.) In Continental Oil, the international with which the union was affiliated changed its name and its affiliation from A.F.L. to C.I.O. In Weyerhaeuser, the international with which the union was affiliated disaffiliated from the A.F.L.-C.I.O. It is, of course, perfectly clear in all these cases that the employers could not refuse to bargain on the ground of change of identity.

The Trial Examiner also cited a number of Board cases.[14] Of these one, Lenscraft, appears to be contra to the proposition for which it is cited. In most of the others there was no claim by a second union.[15] Three of the remaining did

11. For a case in which the Board refused to hold an election to determine representatives where the old union was willing to administer the contract, see Youngstown Steel Door Co., 116 N.L. R.B. 986 (1956).

12. N. L. R. B. v. Weyerhaeuser Co., 276 F.2d 865 (7th Cir.), cert. denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102 (1960); Carpinteria Lemon Ass'n v. N. L. R. B., 240 F.2d 554, 557 (9th Cir. 1956), cert. denied, 354 U.S. 909, 77 S.Ct. 1295, 1 L.Ed.2d 1427 (1957); N. L. R. B. v. Harris-Woodson Co., 179 F.2d 720, 723 (4th Cir. 1960); Continental Oil Co. v. N. L. R. B., 113 F.2d 473, 477-478 (10th Cir. 1940), remanded on other grounds, 313 U.S. 212, 61 S.Ct. 861, 85 L. Ed. 1292 (1941).

13. Dickey v. N. L. R. B., 217 F.2d 652 (6th Cir. 1954) and M & M Wood Working Co. v. N. L. R. B., 101 F.2d 938 (9th Cir. 1939) the Board's finding that a new organization was but a continuation of the old was set aside.

14. Lenscraft Optical Corp., 128 N.L.R.B. 836 (1960); Alto Plastics Mfg. Corp., 119 N.L.R.B. 1458 (1958); Dalmo Victor Co. Div., Textron, Inc., 119 N.L.R.B. 737 (1957); Dryden Rubber Div., Sheller Mfg. Co., 118 N.L.R.B. 369 (1957); R. C. Williams & Co., 107 N.L.R.B. 933 (1954); Charles Beck Mach. Corp., 107 N.L.R.B. 874 (1954); Prudential Ins. Co., 106 N.L.R.B. 237 (1953); Louisville Ry., 90 N.L.R.B. 678 (1950); Chesapeake & Potomac Tel. Co., 89 N.L.R.B. 231 (1950); Michigan Bell Tel. Co., 85 N.L.R.B. 303 (1949).

15. Dalmo Victor Co. Div., Textron, Inc., supra, note 14; Dryden Rubber Div., Sheller Mfg. Co., supra, note 14; Charles Beck Mach. Corp., supra, note 14; Chesapeake & Potomac Tel. Co., supra, note 14; Michigan Bell Tel. Co., supra, note 14.

not involve a refusal to bargain.[16] To the extent that any of these Board cases afford support for the proposition for which they are cited we find them inconsistent with other Board cases, with the cases decided by the courts, and with the accepted principles which we have discussed.

The situation presented in the present case appears to us to be analogous to that with which the Board dealt in Sears Roebuck and Company, supra, where the Board said (at pp. 228–229):

"[The General Counsel] argues, and the Trial Examiner has found, that the present situation is governed by the Harris-Woodson case, in that the Retail Clerks 'was the same as, or the successor to' the certified unaffiliated Council, and that the Respondent was therefore obligated to bargain with the former organization. In the Harris-Woodson case, the Board found that the respondent employer had unlawfully refused to bargain with an industrial union directly affiliated with the C.I.O., and directed the employer to bargain with that union. Subsequently, the industrial union affiliated with Textile Workers Union of America, C.I.O., as the result of a vote of an overwhelming majority of the employees in the old union. Thereupon, the Textile Workers moved to substitute its name for that of the industrial union in the Board's bargaining order. The Board granted the motion, finding that, for the purposes of the bargaining order, the two organizations were the same in view of the fact that the bulk of the members and all the officers were the same. It is significant that after the change of affiliation, no organization remained which claimed to be the original labor union.

"The Harris-Woodson doctrine must be limited to the particular facts of that case. It was not intended to be a vehicle for undermining the Board's contract-bar rule or for encouraging raids on an existing bargaining representative during the life of a valid collective-bargaining agreement. In the present case, the certified bargaining representative did not disappear after the disaffiliation action. Some but not all members shifted to the new organization; most but not all officers transferred their allegiance to the Retail Clerks. The certified unaffiliated Council continued to exist and to represent employees at the Fenway as well as at the Cambridge store. The Retail Clerks therefore stands forth not as the *alter ego* of the certified unaffiliated Council, but like any other union which, during the life of a valid bargaining contract, has succeeded in diverting to itself from the recognized bargaining representative the support of a majority of employees in the bargaining unit. As, at the time the Retail Clerks made its request for bargaining, the Respondent's contract with the unaffiliated Council still had approximately 1 year to run, the demand created no question concerning representation. If, instead of making the demand, the Retail Clerks had filed a representation petition, the Board would have dismissed it. For the same reasons, the Respondent was free to ignore the demand and to continue dealing with the bargaining representative recognized by the outstanding collective-bargaining agreement."

■■  We hold, then, that the Board's conclusion, on which its orders are rested, that Local 335, Independent, is merely the "*alter ego* or continuance" of Local 335, United Marine Division, is not supported by evidence in the record taken as

16.  Alto Plastics Mfg. Corp., supra, note 14; Prudential Ins. Co., supra, note 14; Louisville Ry., supra, note 14.

a whole. On the contrary the situation presented appears to be a fairly typical example of the secession of part of the membership to form a new organization. Under these circumstances the employers cannot be required to bargain with the new organization until its majority status has been established.

The Board formerly designated such a situation a "schism" and, in appropriate cases, ordered an election to permit the employees to express a choice between the old and the new organizations.[17] In Hershey Chocolate Corp., supra, the Board placed a severe limitation on the schism doctrine by holding that it would not order an election (i. e. would require the employer to continue to deal with the old organization) unless the division in the union constituted a "true schism" which the Board defined as one arising in the context of a basic intraunion conflict at the national level. Since a division at the local level, such as we have in the present case, unconnected with a national split, may well be as destructive of the stability of labor relations in the industry as would be a division consequent upon a basic intraunion conflict, it is possible that the Board has confined its policy of allowing an election to choose new representatives to too narrow an area. It cannot, however, escape these limitations by requiring employers in schism situations at the local level to make a choice at their peril between two rival organizations both of which claim representation.

The orders of the Board are denied enforcement and set aside.

---

17. See articles cited supra n. 7 and Board cases cited therein.

1. The Board did not find that the "temporary administrator" had any authority to

KAUFMAN, Circuit Judge (dissenting).

I disagree with the majority's conclusion that the charging party in these proceedings was not the bargaining representative with whom petitioners were required to deal at all times in the period under consideration. As the majority points out, the so-called disaffiliation vote was not taken until May 29, 1960. Petitioners, however, refused to deal with the local's business agent before the May 29 vote; and on May 27, they accorded exclusive recognition to a "temporary administrator" whose credentials they conveniently failed to investigate.[1] Nor is there any doubt in my mind that Local 335, Independent was in fact and in substance a continuation of the Local 335 that entered into the collective bargaining contracts involved in this case. The "Local 335" governed by the "temporary administrator" was clearly nothing more than a "paper local," and petitioners could not possibly entertain any good faith doubt that the deck scow captains belonged to the "Independent." Any doubt they may have had was surely dissipated by a strike which forced them to re-hire employees who had been discharged because they refused to join the "temporary administrator's" paper local. Therefore, the inadequacy of the May 29 disaffiliation vote is immaterial, since at no time was there any local which could enforce the employees' rights under the existing collective agreement but the charging party—by any name. Because of this, and the complete lack of merit which I find in the petitioner's remaining arguments, I would affirm and enforce the order of the Board.

---

take over the affairs of the local, and petitioners do not argue on appeal that the purported "trusteeship" was lawful or proper.